Iola FORTS, Paula Herbert, Cynthia Hall, Laura Carey, Linda Maroon, Carol Crooks, Sharon Silman, Yvonne Lee, Sheila Liles, Deborah Lewis, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Benjamin WARD, Individually and as Commissioner of Correctional Services, Frances Clement, Individually and as Superintendent, Bedford Hills Correctional Facility, Dorothy Reid, Individually and as Deputy Superintendent for Security, Bedford Hills Correctional Facility, Melvin H. Osterman, Jr., Director of Employee Relations for the State of New York, Security Unit Employees Council 82, American Federation of State, County and Municipal Employees, AFL–CIO ("Council 82"), Carl F. Gray, Executive Director, Council 82, Clayton DeFayette, President, Council 82, Local 1265 of Council 82, A. V. Yarell, President, Local 1265, Defendants.

No. 77 Civ. 1560.

United States District Court, S. D. New York.

Nov. 20, 1978.

Order April 11, 1979.

Bronx Legal Services Corp. C, by Stephen M. Latimer, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of the State of N. Y., by Leonard J. Pugatch, Charles A. Bradley, III, Asst. Attys. Gen., New York City, for defendants Ward, Clement, and Reid.

Rowley & Forrest, P. C., by Richard R. Rowley, Brian J. O'Donnell, Albany, N. Y., for defendants Gray, DeFayette, and Council 82.

Brent, Phillips, Dranoff & Davis, Nanuet, N. Y. (Ricardo A. McKay, Congers, N. Y., of counsel), for defendants Yarell and Local 1265.

### OPINION

OWEN, District Judge.

Prior to 1976, only women had been allowed to serve as guards [1] in the living and sleeping corridors of the state prison for women in Bedford, New York.[2] In 1976,

---

1. The job title is "Correction Officer."

2. Male guards were earlier assigned elsewhere at Bedford, such as the grounds, the school and the library. There is no complaint before me as to those assignments.

the State, in perceived compliance with Title VII of the Civil Rights Act of 1964, opened the posts to any qualified applicant regardless of sex.[3] Those men who thereafter successfully bid for these posts under their union's collective bargaining agreement with the State began their duties in February 1977. Within months this action for injunctive relief and monetary damages was commenced by certain inmates, complaining of a violation of their constitutional right to privacy.[4] Named as defendants are the State, certain unions, and certain involved officials of each. A trial of the issues was held before me, sitting without a jury, in December 1977 and January 1978.

The prison involved, the Bedford Hills Correctional Facility, is a state prison for women convicted of serious felonies, including homicide, armed robbery, and drug trafficking. In the housing units, each of some 400 inmates is assigned a solid-walled cell measuring 7' x 10'. Each corridor has 30 cells, 15 on a side. Each cell has a solid door which slides in place and is controlled from a control center at the end of the corridor called "the bubble." Each cell door has a clear glass window measuring 6" x 9". The entire interior of a cell, including the bed and the toilet, is visible to one standing outside at the window.

The plaintiffs charge that the male guards, sometimes in the performance of their jobs—and sometimes not[5]—have observed and can observe them in their cells in states of partial or total nudity during their dressing and undressing,[6] and while sleeping. Plaintiffs also assert that the males not only can but have had occasion to observe certain of them while using the cell's toilet facilities. Finally, plaintiffs complain that since certain of the central showers have partitions only to roughly shoulder height, the requirement that male guards keep them under direct observation while showering creates an impermissibly embarrassing situation.[7]

From the plethora of evidence received on the trial, I conclude that a certain amount of viewing of which the plaintiffs complain has in fact occurred, and that given the physical set-up and the prison's

3. A directive was eventually promulgated entitled *Guidelines for Assignment of Male and Female Correction Officers*. The stated purpose of the directive was to:
   1. Maximize full employment opportunities regardless of sex
   2. Minimize intrusion on individual privacy
   3. Establish guidelines to accomplish both of the above stated goals.
   The directive established various guidelines which reveal the State's obvious awareness of the problems, and its concern for their appropriate resolution:
   1. Security staff members of the opposite sex to the inmate population are not to be permanently assigned to shower areas where one has to work in open view of showering inmates.
   2. Escort duty outside of a facility shall be performed only by officers of the same sex as the inmates to be escorted.
   3. At least one officer of the same sex as the inmate population at a facility must be assigned to each housing block.
   4. No assignment is to be made requiring an officer to conduct strip frisks of inmates of the opposite sex.
       *    *    *    *    *    *
   7. Unless emergency conditions dictate otherwise, correction officers of the opposite sex shall announce their presence in housing ar-

   eas to avoid unnecessarily invading the privacy of inmates of the opposite sex.
   However, Guideline 7, for valid security reasons, is not always honored. See p. 1098, *infra*.

4. See *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

5. A male guard who is a "Peeping Tom" is subject to discipline within the prison administration. A number of guards were so charged in the testimony. Each guard denied such charges. Although certain of the plaintiffs allege monetary damage by reason thereof, the post-trial briefs make no mention of this subject. While I conclude from the testimony received that there were doubtless a number of actionable instances of invasion of various inmates' privacy, I am not satisfied as to the facts of any specified incident to that degree of proof as would support an award of damages.

6. Included in the plaintiffs' charges is the claim that male guards on duty in the prison hospital are in a position to and do observe inmates wholly or partially nude during medical procedures.

7. A complaint as to the stationing of a male guard at the medical dispensary window has been rendered moot.

rules, it is certain to occur again with some frequency.

██ The court is thus required to make an accommodation as between two substantial principles: (1) the right of a prison inmate to some minimum of privacy; and (2) the right of equal job opportunity regardless of sex.[8]

The ultimate resolution of the issues presented to the court requires first, an assessment of the right of privacy of a female prison inmate, difficult as that may be in today's fluid climate, as well as a determination of the extent to which that right is constitutionally protected, and second, a reconciliation of that right with the right of a man to equal job opportunity, balanced in such manner as to minimize the extent to which either right must be curtailed by reason of its conflict with the other.

██ It is perfectly clear that men and women, from the beginning of recorded history, have had an innate need for privacy in certain areas of living. Virtually all societies—even those which have little requirement of clothing for adults and none for children—have rules for the concealing of female genitals.[9] And while societies such as the Samoan have "ma[d]e use of the beach as a latrine," there being "no privacy and no sense of shame," [10] the norm in today's western world is to have enclosed toilet facilities in the home and segregated toilet facilities in public places which children are early taught to use. Even small children in the western world are expected to clothe themselves and keep their private parts covered. These societal rules become mand tory as one approaches adult status. ·

The fact that a need for privacy is the product of social conditioning makes it no less embarrassing or occasions no less feeling of shame when the privacy is invaded.[11] The extent to which privacy may justifiably be limited or invaded when one becomes a prison inmate is a question as to which opinions vary, as was evidenced in this case by the testimony of various penologists, psychiatrists, psychologists, and medical doctors. Obviously, an individual's normal right of privacy must necessarily be abridged upon incarceration in the interest of security of the institution. *Wolfish v. Levi,* 573 F.2d 118, 131 (2d Cir.), *cert. granted sub nom. Bell v. Wolfish,* 439 U.S. 816, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978). Inmates must be kept track of constantly and, on occasion, unexpectedly observed to be sure that plotting is not under way nor is the fashioning of crude but effective weapons, such as pieces of metal sharpened to razor quality to use against either guards or other inmates. Suspected contraband must be searched out and confiscated. Thus, the normal right to close the front door of one's home and be free from observing eyes must give way to the need for a guard to look within.

However, regardless of how limited an inmate's right to privacy is, as viewed by penologists and others, all agree on one thing—that there is such a thing as a right of privacy. All agree that it is an invasion of a female inmate's right of privacy for her to be viewed by a male guard while she is using the toilet—even if he is acting in the normal course of his duties. Penologists differ, however, as to the permissibility of invading the right of privacy. Feder-

---

8. The unions assert that their members have been denied the right to the benefits of collective bargaining agreements with the State. However, to the extent a collective bargaining agreement is in conflict with a constitutional mandate, it is to that extent unenforceable. Therefore, the union's rights can be no greater than those of the State.

9. Alan F. Westin, *Privacy and Freedom* 14 (New York: Atheneum, 1967).

10. Margaret Mead, *Coming of Age in Samoa* 136, 137 (New York: William Morrow & Co., 1928).

11. This, I conclude, would be especially so for a prisoner who is viewed in the nude or on the toilet by a male guard—neither a stranger nor a friend—under circumstances preventing her from protecting herself against that viewing. It is appropriate to note that the women inmates have in the past accepted this inadvertent viewing without complaint when done by women guards.

al prison authorities, it appears, deny protection to female inmates from such invasions of privacy regardless of the time of day or night or the circumstances.[12] Connecticut authorities, on the other hand, permit complete protection at all times under normal circumstances.[13] The Bedford officials here involved permit no protection from approximately 10:00 p. m. until almost 7:00 a. m. the next morning; however, following the morning count and for the balance of the day, Bedford's rules permit an inmate to cover her window up to 15 minutes to use the toilet or change clothes.[14]

█ Turning to the question of equal job opportunity, there is no dispute that the job of a correction officer at Bedford Hills can be equally well performed by any qualified and trained man or woman. Sex is therefore not a bona fide occupational qualification (BFOQ),[15] and these positions, absent compelling considerations to the contrary, must be open to any bidder regardless of sex.

█ However, on the facts before me equal job opportunity must in some measure give way to the right of privacy. I conclude that under normal conditions in a women's prison, it is neither penologically required nor permissible (1) that during the day an inmate be in a situation where a) she may be or must risk being viewed completely or partly in the nude by a male guard in the course of his duties [16] or b) she

---

**12.** Robert Christensen, Administrator of the Correctional Management Branch of the Federal Bureau of Prisons, testified (Tr. 1312–13):

Q. Whenever the inmate is performing personal functions or toilet functions, there is a possibility that a male or female guard can be patrolling the hall and observe what is going on inside [the cell]?
A. That's right.
*   *   *   *   *   *
However, we have found, even though there have been some individual complaints, that the gains far exceeded the negative aspects. . . .

But see note 16, *infra*.

However, Dr. Naomi Goldstein, Chief of Psychiatric Services of the federal Metropolitan Correctional Center in New York City, testified (Tr. 1943):

THE COURT: [You have as] a premise that there is a certain area in which a female inmate has a right to privacy?
THE WITNESS: Yes . . . . .
THE COURT: What do you see that area to be?
THE WITNESS: She must have the options to keep her personal area private in a sense of her exposure, clothing, dressing, undressing. I think that this is a right that every human being has.

**13.** Elizabeth Durland, Superintendent of the Connecticut Correctional Institution at Niantic, testified (Tr. 1374):

THE COURT: Mrs. Durland, do you have any situation and by that I mean your physical layout situation in your facility where a correction officer by looking in a cell window can see a female inmate on the toilet?
THE WITNESS: No.

**14.** A *Rule Book Governing Residents of Bedford Hills Correctional Facility* is provided inmates. Rule 7 of the *General Rules* provides:

Room door windows may be covered only when residents are attending to their personal needs. Windows may be covered no more than fifteen (15) minutes at one time, and are never to be covered at times of the institutional count.

Rule 7 of the *Count Rules* provides:
a. When dressing or attending to other personal needs, the window may be covered for a period not exceeding fifteen (15) minutes.
b. The door's window is never to be covered after 10:00 P.M.

**15.** One notes the view of some inmates at Bedford Hills called by the State who testified that they like having men on the corridor; one further notes and to some degree credits the claim of penologists that having men on the corridors of women's prisons appears under some circumstances to have a normalizing effect on prison atmosphere. It appears that the female inmates behave a little better with men around, and perhaps take a little better care of their appearance and dress. I do not regard this, however, as a factor in any conclusion that I am required to reach.

**16.** I note that the District Court in *Wolfish v. Levi,* 439 F.Supp. 114, 160 (S.D.N.Y.1977), found that in the Metropolitan Correctional Center, the federal facility in New York City, "male guards have been casual about walking into the rooms of female prisoners without allowing time for the occupants to arrange to be fully dressed." The court thereupon held:

Suitable regulations (and the court's decree) must forbid entry into rooms or bathroom facilities by officers of the opposite sex unless (a) there has been sufficient warning or (b) emergent necessity justifies an exception.

may be observed while using the toilet;[17] (2) that during the night she be observed rising from sleep to use the toilet, or suffer herself to be observed perhaps numerous times during sleep in whatever may be her disarray of bed clothes or nightgown[18]—or no garments at all on a hot and airless night;[19] (3) that her head be directly observable by a male guard while she is taking a shower;[20] (4) that a male guard in the prison hospital be so stationed as to permit him under normal circumstances to view an inmate wholly or partly unclothed.

What are some of the existing circumstances at Bedford to which the foregoing may be applicable? During the daytime hours, an inmate in her cell may ask the guard at the "bubble" to close the door, and the rules permit her, using some tape, to fasten paper over her window for up to 15 minutes for complete privacy while changing clothes or using the toilet. This adequately protects her privacy, and during the daytime shifts there is no reason that guards may not be assigned to the housing unit corridors regardless of sex.

■■ The night shift, however, is a different matter. After an inmate is locked in her cell at approximately 10:00 or 10:30 p. m., the prison rules forbid her covering her window until approximately 7:00 the next morning. (See note 14, *supra*). From time to time a guard may look into or shine a flashlight into her cell without warning to see if she is there, without any advance awareness of whether she is using the toilet or, if sleeping, her body is revealed because her bedding or night garments are dis-

---

17. In *In re Long*, 127 Cal.Rptr. 732 (Ct.App.), *dismissed as moot*, 55 Cal.App.3d 798 (1976), a California Court of Appeal had before it a complaint concerning the presence of female guards in the living units of teenage males. This was found to violate the inmates' privacy:

> The governmental interest put forward by the Department of the Youth Authority is the normalization of environment attributable to a mixed male-female staff and the inclusion of parental figures of both sexes within the institution. . . .
>
> . . . As a justification for female observers in the living units and in the toilet and shower areas of the gymnasium, it fails completely. In a normal social setting young men of 19 do not undress, bathe, void or excrete in the maternal presence. They are not forced to disrobe in the bathroom to escape female surveillance. Far from normalizing the environment, the presence of female observers in these areas of the institution violates the norms of privacy prevailing in free society. The department has offered no justification for the violation.

127 Cal.Rptr. at 737.

18. As Dr. Goldstein testified, see note 12, *supra* (Tr. 1949–50):

> THE COURT: Doctor, what about a situation at night where an inmate might be asleep and her sleeping garments get up about her neck in the course of a hot summer's night and there are men guards that are charged with the duty of looking in the window during the course of the night. Is there any problem of embarrassment or otherwise to the inmate upon waking in the morning with the realization that her clothes have been off, in effect, and there had been men guards looking at her in the course of their duties?

> THE WITNESS: . . . she can't control where the nightgown goes.
>
> THE COURT: She has no options of [covering] the window at night and she can't control where the nightgown goes, unless assuming she is sewn into a bag of some kind. What about that situation?
>
> THE WITNESS: This might be embarrassing. I note that the order entered at the conclusion of *Wolfish v. Levi* (see note 16, *supra*) does not require a male guard looking into a female inmate's cell to give warning between the hours of 11:00 p. m. and 6:30 a. m., when she is "normally asleep." Given the testimony before me, I feel constrained to reach a different conclusion.

19. There has been testimony that this occurs. Tr. 203–205.

20. As Dr. Lesley D. Kurian, Chief Psychiatrist at the Bedford Hills Correctional Facility, testified (Tr. 1890):

> THE COURT: . . . as I understand your testimony, Dr. Kurian, in a situation where the guard on the "bubble" can see the inmate's head and shoulders and feet while she is showering, that would cause embarrassment even though he can see nothing else of her, because the fact of the matter is [she] knows she has no clothes on and she knows he knows she has no clothes on?
>
> THE WITNESS: It's not the fact of the guard seeing the person; it's the fact of the person being able to see the guard.
>
> THE COURT: Because she knows she has no clothes on and she knows that he knows she has no clothes on.
>
> THE WITNESS: Exactly.

arrayed or cast aside. In the latter circumstance, an inmate may awaken in the morning to the awareness of the extent to which she has been on view during the night.

There is inherent in the foregoing, the inmate being unable to protect herself, the risk of at least embarrassment or shame or humiliation from actual or potential viewing during the night by males whose duty it is to watch her.[21] I therefore conclude that it is a violation of the inmate's right of privacy to have male guards assigned to such duties during the night.[22] Further, somewhere between 6:30 and 6:45 in the morning, the inmates are awakened and all the cell doors are simultaneously rolled open by a master switch. Each inmate is thereupon to present herself for the morning count, which obviously takes several minutes, while the guards go up and down the long corridors. At that point, the inmates obviously do not have even the door to protect them from anything. Some inmates may wish to use the toilet upon arising; some, while waiting, may wish to change from night clothes into day clothes; one may find her night clothes and bedding visibly soiled from an unexpected menstrual flow and wish to clean up;[23] yet the present rules for the security of the prison require that each inmate present herself to be counted at that hour regardless of the state of her clothing or the calls of nature. Under these circumstances, I deem it inappropriate for a male guard to be making the first count of the morning—with the inmates just awakened and their doors locked open.

█ Turning to the shower facilities, showers are taken during the day. Certain shower stalls, visible from the "bubble," have a little cubicle outside the shower in which to dress; yet the partitions go only to the shoulders. Thus, a guard and a prisoner may look directly at each other while the inmate is showering or changing. While this, in my judgment, is an invasion of privacy, I deem it easily correctable by such means as the appropriate positioning of mottled or smoky glass which permits a guard to observe that there is, in fact, a person in the shower and assure himself of her appropriate and timely departure after use of the shower without being able to recognize the specific inmate or the showering inmate being able to recognize other than general forms.[24]

As to all the foregoing, it is appropriate to observe that underlying the conclusion of the primacy of the conceded right of privacy, even for a prisoner, is a concern for the preservation of such minimum of human dignity and such remnant of the quality of life as remains possible, notwithstanding that the inmate has forfeited the right to be among society. While some out-of-the-ordinary steps are justifiable to reconcile the conflicting rights here, to require of an inmate extensive artificial procedures to preserve minimal human dignity in order to enable a man to be her guard at such times is, in itself, a diminution of that dignity and is, in my opinion, too high a price to pay for the equality of job opportunity achieved at its expense.

█ Two matters remain to be discussed: first, certain of the inmates testified that they are converts to the Muslim faith, and contend that the conditions at Bedford are a denial to them of their right to exercise

---

**21.** The State furnishes a "privacy curtain" that can be hung across an open door in the daytime. It is not so high that it cannot be looked over, and in any event its use is not permitted at night or at the time of the morning count.

**22.** Some penologists who support the assignment of men to women's living corridors assert that the presence of men has a "normalizing" effect (Tr. 1299–1300). One notes that they are in fact consciously exploiting the sexual difference that sets up subtle (and perhaps not so subtle) currents between the guards and the inmates. Given the effect that even these pe-

nologists recognize may be caused where men are working in the view of the women, the Court acknowledges a certain feeling of inappropriateness in the placing of men in a position to peer in upon as many as 60 sleeping women throughout the night during the course of their work.

**23.** This has occurred. Tr. 277–81.

**24.** This is currently in use in the federal system. Tr. 1293.

their religion. They explain that according to the Holy Q'ran they are to "cast down their eyes and guard their private parts and . . . not display their ornaments except to their husbands" or certain other close relatives. They assert that it is specifically forbidden by the "Hadith" to expose their private parts to a person of the opposite sex. There was cross-examination as to the sincerity of their beliefs and as to the extent of their obedience to the fundamental tenets of Islam. The genuineness of religious belief on the part of any specific plaintiff, however, need not be decided here. It is clear that the right to privacy that I conclude must be extended to prisoners generally would permit any Muslim inmate to live in full compliance with the tenets of Islam as these have been urged upon the court.[25]

Finally, plaintiffs renew their motion to certify the action as a class action. This motion was denied before trial with leave to renew. There is nothing before me that changes my view on this subject heretofore expressed, and the motion is again denied. See *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974).

Recognizing that "courts are singularly ill-suited to administer the minutiae of the daily affairs of prisons," *Wolfish v. Levi, supra,* 573 F.2d at 120, I leave the task of fashioning appropriate relief in the first instance to the expertise of prison officials.

The State of New York is therefore to submit to the court within 30 days a proposed order providing for either such amended assignment schedules or prison regulations or such physical changes in the facility or such other proposals as, while maximizing equal job opportunity, will afford each inmate the minimal privacy to which the court concludes she is entitled.[26]

---

**25.** Plaintiffs argue that the Q'ran rule prohibiting men from entering the homes of women without their permission mandates the exclusion of male guards from prison housing units without the consent of each Muslim inmate. In a penal institution, such an unusual *religious* tenet must of necessity yield to the "important [and] substantial government interest" in prison security and equal employment opportunity.

## ORDER

The above entitled action having been tried before the Honorable Richard Owen, one of the Judges of this Court, without a jury, which trial was concluded on January 16, 1979, and the Court having rendered its opinion on November 20, 1978, which opinion directed the State defendants to submit an order in implementation of that opinion, and a conference having been held on February 23, 1979, at which time the Court directed the State defendants to modify the proposed order submitted to the Court, now therefore it is

ORDERED, that during the nighttime period when female inmates are locked within their cells in the Housing Units of the Bedford Hills Correctional Facility (BHCF), currently the period between 10:30 P.M. and 6:30 A.M., no male correction officers stationed at the BHCF shall have duties which require them under normal circumstances to observe female inmates through the windows of each inmate's cell, and it is further

ORDERED, that no male correction officers shall be stationed in medical examination rooms located within the infirmary at BHCF on any occasion when female inmates disrobe for the purpose of medical examination, and it is further

ORDERED, that no male correction officer shall be assigned to a station in the infirmary at BHCF where in the normal course of hospital procedure that officer would be likely to observe a female inmate in the nude, and it is further

ORDERED, that the present procedure during the 6:30 A.M. count, or morning count, shall continue insofar as inmates are

---

See *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975).

**26.** For example, it may be that during the 6:30 a. m. count privacy and equal employment interests can both be accommodated by leaving the cell doors closed and permitting an inmate in the event of need to cover the window and respond verbally.

told five minutes before the count that the count will occur, and that under normal circumstances, during this five minute period no male officers shall enter the housing unit corridors, and it is further

ORDERED, that translucent shower screens shall be erected on all showers so as to assure the privacy of those inmates who shower, and it is further

ORDERED, that at all. times female correction officers will be available in the housing units to care for female inmates should emergency situations arise which might require the need for inmate privacy, and it is further

ORDERED, that plaintiffs' motion to have this action certified as a class action is hereby denied, and it is further

ORDERED, that plaintiffs' request for further injunctive relief is hereby denied, and it is further

ORDERED, that that part of plaintiffs' complaint which claims that the First Amendment rights of female Muslim inmates have been violated is hereby dismissed, and it is further

ORDERED, that plaintiffs' complaint insofar as it demands money damages is hereby dismissed, and it is further

ORDERED, that each party may make application for their costs and attorney's fees, and it is further

ORDERED, that each party may make application to this Court for a modification of this order.