Argued and submitted September 10, 1979, resubmitted
in banc February 14, affirmed February 25,
reconsiderations denied April 24,
petitions for review allowed May 28, 1980

# DAVID J. STERLING, THOMAS E. CAPPS,
# AND WILBUR G. HIXSON,

*Respondents,*

*v.*

## CUPP, et al,

*Appellants,*

## DERR, et al,

*Intervenors-Appellants.*

## (No. 108452, CA 13246)

607 P2d 206

Scott McAlister, Assistant Attorney General, Salem, argued the cause for appellants. With him on the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and Barbara A. Brainard, Certified Law Student, Salem.

Jossi Davidson, Salem, argued the cause and filed the brief for respondents.

Terry A. Pressler, Salem, argued the cause and filed the brief for Intervenors-Appellants.

GILLETTE, J.

JOSEPH, J., dissenting.

ROBERTS, J., dissenting.

## GILLETTE, J.

Plaintiffs are male inmates of the Oregon State Penitentiary (OSP). They sought to enjoin the defendant officials of the Corrections Division (Division) from assigning female correctional personnel "to duties which include frisking male prisoners, except in an emergency situation." The trial court granted the relief sought. Defendants, and certain female corrections officers who are intervenors, appeal. We affirm.

Beginning relatively recently, at least in part out of concern about requirements of federal and state legislation prohibiting discrimination in employment because of sex, the Division assigned female guards to jobs at OSP which involve direct contact with male inmates. Among the duties which the jobs entail are frisks or body searches of clothed inmates. The searches are brief in duration—apparently lasting about 30 seconds—but involve some touching of genital and anal areas through clothing. They are carried out randomly and have the objectives of preserving security by locating contraband. "Probable cause" is not a prerequisite to the performance of a search, and plaintiffs do not contend that searches of this kind when conducted by male guards are unnecessary to prison security or are unreasonable. Their contention is that the physical contact by female guards violates their constitutional right to privacy.[1]

In *Pell v. Procunier,* 417 US 817, 94 S Ct 2800, 41 L Ed 2d 495 (1974), the Supreme Court stated that the constitutional rights of inmates must be balanced

---

[1] The source of this right is not entirely clear, although no court appears to have denied that prisoners retain some right of privacy which is of constitutional dimension. *See Forts v. Ward,* 471 F Supp 1095 (SD NY 1979), where the existence of the right was acknowledged but not attributed to a specific constitutional provision; and *City of Philadelphia v. Pennsylvania Hum. Rel. Com'n,* 7 Pa Comwlth 500, 300 A2d 97, 103, n 8 (1973), where the right was apparently predicated on the penumbral freedom theory of *Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965). *See also* the discussion in *In Re Long,* 127 Cal Rptr 732, 734 (DCA 3, 1976).

[757]

against "legitimate penological objectives of the corrections system." 417 US at 822. That statement is particularly opposite to privacy rights of inmates, who inherently and necessarily enjoy very little privacy and are subject to intrusive ongoing supervision by corrections personnel. In recent years, there have been several cases from other jurisdictions dealing with the privacy rights of inmates and with the role in the correctional setting of guards who are of a different sex from the prisoners. Those cases have been initiated either by inmates complaining of deprivations of privacy or by persons who have been refused employment or assignments at correctional facilities because they are of the opposite sex from the persons incarcerated and who contend that they have thereby been denied employment opportunities on the basis of sex.

We are not aware of any case in which the primary issue has been security frisks of clothed prisoners. The issue in some of the cases has been whether privacy rights are abridged by guards of the opposite sex being in a position of surveillance over inmates when the latter are unclothed or are engaged in activities which are not normally performed in the presence of members of the opposite sex (*e.g.,* when the inmates are using the toilet, undressed, dressing or undressing, sleeping, and like situations).

In *Forts v. Ward,* 471 F Supp 1095 (SD NY 1979), female inmates of a maximum security facility brought suit for injunctive relief and damages arising out of surveillance by male guards while the inmates were in a state of undress, using toilet facilities, showering or sleeping. The court held that such surveillance violated the inmates' right to privacy and directed prison officials to submit a plan for alleviating the offending conditions. The court did not hold that the inmates were entitled to total insulation from male surveillance, but only that certain accommodations were to be made to assure the inmates the ability to carry on private acts outside the view of the male personnel. The court also concluded in *Forts* that male

guards were entitled to equal job opportunities at the female prison. However, the court stated:

"\*\*\* [O]n the facts before me equal job opportunity must in some measure give way to the right of privacy." 471 F Supp at 1099.

In *In re Long,* 127 Cal Rptr 732 (DCA3 1976), the California District Court of Appeal reached essentially the same conclusions as the federal district court did in *Forts.* The petitioners were male inmates of a facility operated by the California Youth Authority. As summarized by the court, the petitioners

"\*\*\* allege that female employees supervise their showers, latrine use and the sleeping quarters in which they change clothes. They allege that female employees conduct 'skin searches.' They also allege that female staff members have been present to supervise the dressing, shower and toilet areas of the school, the gymnasium and the swimming pool." 127 Cal Rptr at 732-733.

Basing its decision on a California constitutional provision, but also relying on United States constitutional provisions and interpretations, the court concluded that the surveillance practices violated the inmates' right of privacy. The justification the defendants in *Long* advanced for those practices (and which is also advanced as a justification by the defendants and intervenors in the present case) was that the presence of female supervisory personnel in the male facility was conducive to "normalization of environment attributable to a mixed male-female staff \*\*\*." 127 Cal Rptr at 737. The California court concluded, however, that the proffered justification was unsatisfactory to explain the practices in question, because normal societal expectations outside of domestic relationships do not include visual contact between the sexes while the kinds of activities involved are taking place. The court directed the defendants to remove female staff members from the areas where such activities occurred.

[759]

The other cases we have found or which plaintiffs call to our attention were brought by persons who had sought and been denied employment by or assignments at facilities where members of the opposite sex were incarcerated. The holdings in these cases have been mixed and have turned on whether sex is a "bona fide occupational qualification" sufficient to justify sexual limitations on employment at correctional facilities under federal law or the law of various states. The privacy issue in the sex discrimination cases has generally been considered—if at all—in *dicta. See, e.g., Gunther v. Iowa State Men's Reformatory,* 462 F Supp 952 (ND Iowa, 1979); *Carey v. New York State H.R. Appeal Bd.,* 61 App Div 2d 804, 402 NYS 2d 207 (1978). Federal courts have consistently held that sex is not a bona fide occupational qualification for hiring of corrections personnel,[2] although some, including the United States District Court in *Reynolds v. Wise,* 375 F Supp 145, 151 (ND Tex 1974), have indicated that "selective work responsibilities" to "insure privacy of inmates" is permissible. The court in *Reynolds* implicitly recognized that there *can be* bona fide occupational qualifications for certain work *assignments* if the work would conflict with inmate privacy rights.

In the present case the female officers are not assigned to duties involving observation of inmates engaging in activities of the kinds the courts in *Forts* and *Long* held constitutionally insulated from opposite sex surveillance. Nonetheless, plaintiffs argue that the physical contacts involved in the frisks which are conducted by female guards are at least as intrusive

---

[2] In *Dothard v. Rawlinson,* 433 US 321, 97 S Ct 2720, 53 L Ed 2d 786 (1977), the court held that Alabama's policy against employing female guards in contact positions at the state's male maximum security prisons was supported by a bona fide occupational qualification. The bases for that decision were that the state's prisons were characterized by rampant violence and that, according to expert testimony, sexual assaults of female guards would be extremely probable given prevailing conditions at the prisons. *Dothard* was decided on its facts, and later decisions have confined it to its facts. *See, e.g., Gunther v. Iowa State Men's Reformatory,* 462 F Supp 952, 955 (ND Iowa, 1979).

as the visual surveillance considered impermissible in those and other cases. We agree.

At the heart of the privacy analysis of cases like *Forts* and *Long* lies the assumption that the final bastion of privacy is to be found in the area of human procreation and excretion and the nudity which may accompany them. If a person is entitled to any shred of privacy, then it is to privacy as to these matters. And, it seems to us, if a prisoner is entitled—absent an emergency—to be free of visual inspection by prison personnel while in the nude, the prisoner is equally entitled to be free from the tactile equivalent of the nude inspection, *viz.*, manual examination of the anal-genital area through clothing.

Finally, the intervenors here present a claim that to accord plaintiffs the privacy they assert, with the consequent limitations on employment opportunities for women, would violate Title VII of the Civil Rights Act of 1964, 78 stat 253, as amended 42 USC 2000e *et seq.* The short and complete answer to this contention is that the prisoner's constitutional right prevails—as every constitutional right must—over any statute, state or federal. *Forts v. Ward, supra,* 471 F Supp at 1099.

None of the parties appear to believe that a prison inmate foregoes entirely the right of privacy recognized in *Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965). The issue is over how extensive the right is.[3] This case lies very near the

---

[3] Our recognition of the right of privacy draws particular fire from one of the dissenting opinions which, with flouishing hyperbole, states that

" * * * no one has ever been able to furnish a principled constitutional explanation of the supposed right." (Dissenting opinion of Joseph, J., at 1).

Elsewhere, our utilization of the right of privacy is characterized as " * * * a constitutional principle picked out of the air." (*Id.,* at 5).

However much difficulty the dissent may have in finding this "supposed" right, we have no difficulty in perceiving it in *Griswold v. Connecticut, supra; Eisenstadt v. Baird,* 405 US 438, 31 L Ed 2d 349, 92 S Ct 1029

dividing line. We are persuaded, however, that the right extends so far as to limit the conducting of the searches under discussion here—absent emergencies—to prison guards of the same sex as the prisoner being searched. Such a ruling may create marginal inconvenience for the prison administration—the Constitution is not a document of convenience. But we are satisfied that the little that remains of a prisoner's consititutional right to privacy is lost if the prisoner's genital area may be searched—either visually or by touch—by a member of the opposite sex.

The judgment of the trial court is affirmed.[4]

**JOSEPH, , J., dissenting.**

The majority opinion is admirable—up to where it begins to discuss the basis for deciding *this* case. From that point on it utterly abandons any effort to apply law to the facts or to explain in what way the personal preferences it expresses are supported by the state or federal constitutions. At the very least the parties ought to be furnished some explanation, any explanation, of the source and scope of the right of privacy the opinion would protect. It is understandable why the majority fails to do that, for aside from the *Griswold* case (which is wholly beside the point here) and other

---

(1972); *Loving v. Virginia,* 388 US 1, 87 S Ct 1817, 18 L Ed 2d 1010 (1967); and *Roe v. Wade,* 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973). The fact that the parameters of the right cannot be fully discerned from those cases does not excuse us from determining whether it is applicable in the context presented here. We hold that it is.

[4] The trial court's judgment in this case provided,

"IT IS HEREBY ORDERED that Defendants Hoyt C. Cupp and Robert J. Watson are enjoined from assigning female correctional officers to any position in which the job description or actual duties include frisks or pat-downs of male prisoners, except in emergency situations."

We understand this order to require nothing more than that guards of the opposite sex may not—absent an emergency—conduct a through the clothing frisk of a prisoner's anal—genital area. As so understood, it is affirmed.

vague *dicta* described in the opinion, no one has ever been able to furnish a principled constitutional explanation of the supposed right.

The majority follows *Long* and *Forts,* but that will not wash. *Long* is a California state case, which, of course, is not binding here even if it does purport to rest on the federal constitution in the main. *Forts,* from a federal trial court, is no more binding; and whatever force it might otherwise have once had is considerably diminished, if not destroyed, by the Supreme Court's reversal of *Wolfish v. Levi,* 573 F2d 118, (2d Cir 1978) *sub nom Bell v. Wolfish,* 441 US 520, 99 S Ct 1861, 60 L Ed 2d 447 (1979). The Second Circuit's view of the extent of prisoners' privacy rights must be taken to have informed the opinion in *Forts* by the federal district court for the southern district of New York. But little or nothing is now left of that view after the Supreme Court's decision.

The process of applying *Bell v. Wolfish, supra,* to the instant case requires caution. Plaintiffs here are sentenced offenders; in *Wolfish* (in the Supreme Court) the prisoners were federal pre-trial detainees. Therefore, that case is a Fourth and Fifth (and First) Amendments case, not an Eighth and Fourteenth Amendments case.[1] Still, the view of the Eighth Amendment rights taken in *Wolfish* would avail these plaintiffs nothing. In a footnote the Supreme Court cited without apparent disapproval the Second Circuit's holding that "[a]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." (Slip opinion at 7, n 11.) And later, with apparent approval, it cited the restrictive reading of the amendment's scope and utility in *Ingraham v. Wright,* 430

---

[1] Plaintiffs here asserted *state* constitutional claims under Article I, sections 3, 13, 15, 16, 20 and 33 of the Oregon Constitution, as well as *federal* constitution of claims under the Eighth, Ninth and Fourteenth Amendments. The state bases for their claims were not developed and were not relied on in this court at all. *Compare Cooper v. Morin,* 26 Cr L 1065 (NY Ct of App, December 19, 1979).

US 651, 97 S Ct 1401, 51 L Ed 2d 711 (1977). (Slip opinion 13, n 16.) Moreover, the opinion elides almost any distinctions between the rights of pre-trial detainees and sentenced offenders in listing the "general principles that inform *** evaluation of the restrictions at issue." (Slip opinion at 23-27.)

If one were merely to apply the *dicta* in *Wolfish,* the conclusion would be well nigh inescapable that the Eighth Amendment applied to the states through the Fourteenth Amendment does not implicate *any* right of privacy. Moreover, the United States Supreme Court has never held that the penumbral right of privacy discovered in *Griswold* exists in a prison context. In *Wolfish* the court avoided the issue by assuming "arguendo" that the district court was correct in finding prisoners' interest in privacy was part of the Fourth Amendment—and then proceeded to hold "shakedown" room searches out of the occupants' presence to be reasonable. Similar short shrift was given a privacy claim as to *visual* inspections of body cavities as a part of strip searches routinely conducted after every contact visit with a person from outside the institution. Finally, the room searches and visual examinations[2] were held not to violate the Due Process Clause of the Fifth Amendment.

It is not necessary to accept the whole of the majority's views in *Wolfish* insofar as particular practices were approved there. The key language for our concerns is this:

"*** [T]he determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose. *** Insuring security and order at the institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both. *** Respondents

---

[2] The court emphasized the visual nature of the examinations. (Slip opinion at 36, n 39.) The process described, though, does not suggest that the manner of obtaining the vision was in any sense dignified.

simply have not met their heavy burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices. \*\*\*" (Slip opinion at 39-40.)

Plaintiffs here concede that random pat-downs are necessary for the security of the institution. The responsible administrative officials have determined that that function can be efficiently performed by guards irrespective of their gender. On the other hand, those officials have also determined that the security requirements of the institution do not require that gender be ignored as to some other job assignments. That determination may well be viewed as according to the inmates a degree of privacy, but it does not follow that the prison administrators have made a distinction that we must examine in the light of either the state or the federal constitution.

The plaintiffs' approach, which seems to have been followed in part by the trial court and which must be the basis of the majority opinion, is that the burden was on the Division to sustain the assignment of women guards to the subject work in the face of a constitutional challenge. That is wrong, as the quote from *Wolfish* makes very clear. Furthermore, it is not for courts to substitute their judgment for that of the administrators unless and until it has been shown that the particular practices are punitive and are without a foundation in security needs. The most that can be said of the plaintiffs' showing here was that the plaintiffs (to differing degrees)[3] and some proportion of the general prison population[4] found the touching of

___

[3] One of the plaintiffs testified that he was not particularly affected by the *fact* of a frisk by a female guard; he objected to the *manner* and *thoroughness*, which he felt was different than that done by men. That plaintiff also voiced what he termed "moral objections" to being frisked by a female.

[4] The prison psychologist gave an estimate that approximately one-third of the prisoners were negatively affected by being frisked by a female; approximately one-third were indifferent to the matter; and the remaining third had no objection and appreciated having some degree of human female contact.

[765]

genitalia and anal areas through their clothing offensive. No attempt was made to show that the use of women guards was done for punitive or any other constitutionally impermissible reason.

The trial judge found that *plaintiffs* had failed to prove that institutional security, family situations and religious beliefs were adversely affected by employment of women in frisking situations. He then said, "In my opinion, it is just common sense that women correctional officers not be required to or permitted to touch the anal and genital areas of prisoners during routine searches and frisks." Absent a constitutional foundation, that was simply the substitution of his idea of how to run a prison for that of the responsible officials. That was error. The majority, I suppose, does not claim the support of common sense. Instead, it applies a constitutional principle picked out of the air. That is both sleight-of-hand magic *and* error.

I dissent.

RICHARDSON, J., joins in this dissent.

**ROBERTS, J.,** dissenting.

I dissent because in my opinion the majority will create chaos in law enforcement in this state. I dissent for the following reasons.

The majority reacts as the average law-abiding members of our population would react personally to such a search and applies the law in that setting. More importantly, the opinion treats this case as though there is a sexual right of privacy which would preclude any search that involves the touching of genitalia of prisoners by either sex. If the male prisoners have the right of privacy as discussed in the majority opinion

they have a right not to be searched at all or, at least, to be searched by the sex of their choice.[1]

At the opposite extreme, the attitude of the dissent seems to be that prisoners have so few rights that they cannot be heard to complain. There appears to me to be another view. Justice Marshall in his dissent in *Dothard v. Rawlinson,* 433 US 321, 346 n 5, 97 S Ct 2720, 53 L Ed 2d 786 (1977), brings that view into focus.

> "* * * If women guards behave in a professional manner at all times, they will engender reciprocal respect from inmates, who will recognize that their privacy is being invaded no more than if a woman doctor examines them. The suggestion implicit in the privacy argument that such behavior is unlikely on either side is an insult to the professionalism of guards and the dignity of the inmates."

What we are confronted with here has far greater implications than are apparently recognized by either the majority or other dissenting opinion, but at least the conclusion of the dissent would bring about a more reasonable result. Under the majority decision we could have the following situations: female guards would not be permitted to pat-down male inmates and male guards would not be permitted to pat-down female inmates; female parole officers would not be able to search male parolees and male parole officers would not be able to search female parolees; a female police officer would not be able to search a male suspect and male officers would not be able to search a female suspect; a female police officer could not "stop and frisk" a male detainee nor could a male police officer do likewise of a female detainee. The problems for law enforcement are beyond the imagination. I ask whether the reasonable search which has been held to

---

[1] It is interesting to speculate what choices there might be—heterosexual males searching heterosexual males, heterosexual females searching heterosexual females, heterosexual males searching homosexual females, homosexual males searching homosexual females, heterosexual males searching homosexual females and heterosexual females searching homosexual males.

be valid under the Fourth Amendment to the United States Constitution and under our statutes is now to be applied only when the "searcher" and the "searchee" are of the same sex?

In the setting of the prison searches I agree with the four-prong test of reasonableness set out in *Bell v. Wolfish,* 41 US 520, 99 S Ct 1861, 60 L Ed 2d 447, 481 (1979).

> "* * * Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted. * * *"

Applying these criteria to the present situation only the first two are bases for the complaint. In my opinion the scope of the intrusion must be defined objectively and not based on the subjective reaction of the individual searched. On the second criterion there is no allegation that the searches conducted by female guards were other than professional.

Aside from all the arguments of equal employment opportunities, the complexities of modern law enforcement procedures simply do not allow us the convenience of sexual preference in searches which are required in a penal institution.

For these reasons I respectfully dissent.