Argued and submitted September 11, 2019, affirmed May 19, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DANTE LAMON TAPLIN,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR61125, 14CR30755;
A166010 (Control), A166012

491 P3d 80

In this consolidated criminal appeal, defendant challenges, among other things, the denial of his motion to suppress evidence found in a jail holding cell. Defendant argues that the jail deputy's act of lifting a privacy curtain while defendant was in the cell to use the bathroom constituted an unlawful search under both the state and federal constitutions. The state, in turn, asserts that the trial court did not err because defendant did not maintain a protected privacy interest in the holding cell and that defendant had no reasonable expectation of privacy while in the holding cell. *Held*: Even if defendant maintained a privacy interest in the holding cell for purposes of using the bathroom, the jail deputy's act of partially lifting the curtain to check on defendant did not amount to an intrusion under the circumstances of this case that violated defendant's rights under Article I, section 9, of the Oregon Constitution. Similarly, the deputy's act did not violate the Fourth Amendment to the United States Constitution. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

Jerry B. Hodson, Judge.

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Lauren P. Robertson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and Powers, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

In this consolidated criminal appeal, defendant appeals from two judgments of conviction raising five assignments of error and two *pro se* supplemental assignments of error. We write to address defendant's second assignment of error; we reject the remaining assignments of error without written discussion. In his second assignment, defendant challenges the denial of his motion to suppress evidence found in a holding cell. Defendant argues that the jail deputy's act of lifting a privacy curtain while defendant was in the cell to use the bathroom constituted an unlawful search under both the state and federal constitutions. The state, in turn, asserts that the trial court did not err because defendant did not maintain a protected privacy interest in the holding cell. For the reasons explained below, we affirm.

We review the denial of a motion to suppress for errors of law, and we are bound by the trial court's findings of historical fact if there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We state the facts in accordance with that standard.

In September 2016, Officer Sparks was working as an undercover officer in the Old Town district of Portland, an area known for its high rate of drug-related activity. Sparks observed defendant among a "group of people that were trying to conceal what they were doing." Sparks watched defendant reach into his pocket and take out a plastic baggie. Using binoculars, Sparks saw that the baggie contained "something consistent" with crack cocaine, and watched defendant "pour [the contents of the baggie] out into his hand" and then pour the contents into the hand of a woman that had approached the group. Afterwards, defendant and the woman "immediately broke contact" and each walked away.

As that was happening, a marked police car drove by the group. Sparks saw defendant "key in on the car" and that, as it drove by, defendant "immediately snatched the bag up, put his hands in his pocket[,] and started walking westbound." As defendant was walking, Sparks saw

defendant's hands dip into his pockets and then down the front of his pants.

By then, Sparks had radioed other officers that he had probable cause to believe that defendant had committed the crime of delivery of cocaine and had provided them a description of what he had observed. Two officers who were also patrolling the area located defendant and attempted to make contact with him; however, as one of the officers exited the police car, defendant started running. The officers called for further back-up and eventually defendant was taken into custody. Officer Dauchy *Mirandized* defendant and conducted an inventory search of his person. Dauchy did not find anything on defendant except a plastic bag of coins. As Dauchy conducted the inventory search, another officer ran defendant's name and discovered a warrant for his arrest. Officers transported defendant to the Multnomah County Jail.

As part of the booking process at the jail, defendant was strip searched for contraband. Nothing was found during the strip search. While officers were completing booking paperwork, defendant asked to use the bathroom. The officers initially responded by asking him to wait until they finished inventorying his property, but defendant repeatedly asked to use the bathroom. Eventually, Sergeant Blair offered to escort defendant to one of the holding cells to use the bathroom. At the suppression hearing, Blair explained that the holding cells are used for a variety of purposes when individuals are first taken into custody: combative individuals requiring a place to be secured, individuals with medical needs requiring privacy, individuals suspected of concealing drugs or contraband requiring a strip search, and individuals requiring the bathroom when the booking process is slow or busy. The holding cells consist of a toilet, a sink, and a bench for individuals to sit. Each cell also has a window made of safety glass with "little holes on the side" that allow individuals to communicate through the window. A "privacy curtain," which can be moved up and down by a corrections deputy, covers each cell window.

Blair escorted defendant to one of the holding cells, shut the door, and put the privacy curtain down. Blair

testified that the cell doors locked from the outside such that detainees have to either hit a call button that flashes a light for the deputies, knock on the door, or talk through the window to let the deputy know that they need something. Blair further testified that it was not uncommon for intoxicated detainees to fall asleep or for detainees to "just wait and wait" for a deputy to come back and open the cell door.

Blair did not hear sounds consistent with bathroom use. Blair explained that, because the cells have stainless steel toilets, "you can hear people urinate" from outside the cell. After approximately 30 seconds had elapsed after defendant entered the cell, Blair went to check on him having not heard defendant urinating or flushing. (Blair initially testified that a couple of minutes had passed but, after watching the surveillance video, acknowledged that it was approximately 30 seconds.) Blair partially lifted a corner of the privacy curtain and asked defendant "if he was going to take a pee or not."

When Blair lifted the privacy curtain to look into the holding cell, she saw defendant standing in the opposite corner of where the toilet was located, with his back to the door. After Blair asked defendant if he was going to use the bathroom, defendant turned around, said "yes," and turned to face the toilet. Blair then put the curtain back down. However, she found defendant's behavior "odd" and immediately lifted the privacy curtain back up. Blair testified that defendant was standing "as if he was going to use the restroom" with his hands at his waist, and Blair saw something drop between defendant's legs into the toilet. Blair then opened the door and ordered defendant out of the cell. Defendant repeatedly attempted to flush the toilet before leaving the cell, but—unknown to both Blair and defendant—the water had been turned off. Throughout her entire interaction with defendant, Blair never saw defendant unclothed. When Blair entered the cell, she "saw a plastic bag floating on top of the toilet water." The bag contained a "white powdery substance" that later tested positive for cocaine. Defendant was charged with unlawful delivery of cocaine, unlawful delivery of cocaine within 1,000 feet of a school, and unlawful possession of cocaine.

At trial, defendant moved to suppress the evidence of cocaine found in the toilet of the holding cell. Defendant relied on Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution to argue that suppression was required because Blair violated his right to privacy when she lifted the privacy curtain and observed defendant in the holding cell where he had been placed to use the bathroom.[1] Defendant asserted that, because Blair pulled down the privacy curtain specifically for the purpose of giving him privacy to use the bathroom, there was no reason for her to pull up the curtain after approximately 30 seconds.[2] In response, the state contended that as a detainee, defendant had no right to privacy in a jail cell bathroom. Furthermore, the state argued that Blair's act of conducting a "quick peek" to check on defendant was not unreasonable.

The trial court denied defendant's motion to suppress, concluding that Blair's actions did not amount to a constitutional violation:

"It's my factual finding that Sergeant Blair was credible as a witness. Even though her memory of the event did not play out or was not confirmed in terms of the timing by the video, I don't find that she committed perjury or otherwise intentionally made a misstatement. I think that's just an issue of people having issues with memory or estimating time.

"I do find that her statements about her reasons for lifting up the privacy curtain the first time there are legitimate reasons for her doing that. And I think the video confirms her statements in that she was making such a quick look at this just to see if everything was all right in there that there was not any nefarious intent in doing that.

---

[1] Article I, section 9, provides, in part, that, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" The Fourth Amendment, provides, in part, that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

[2] Defendant also argued before the trial court that he had "a privacy interest in not being obtrusively viewed in various forms of undress" by a deputy of the opposite sex. He does not renew that argument on appeal and, therefore, we do not address it.

"So I don't find that there's a constitutional violation by opening up the privacy screen the first time. Once she opened the privacy screen the first time and saw that [defendant] was not in a state of undress, there's not just a general privacy right that he had absolute privacy in this area.

"She saw that he was doing something or in an area that was not, he was not using the toilet even though he said that's the reason he needed to go in there was to use the toilet. That justified her opening the screen the second time and the third time. So I'm denying the motion to suppress for violation of his constitutional rights to privacy."

At trial, a jury found defendant guilty of all charges.[3]

On appeal, the parties largely renew the arguments that they made before the trial court. Defendant contends that under Article I, section 9, he had a right to privacy in using the bathroom in the holding cell. In support of that argument, defendant points to a prior decision in which we observed that the "final bastion of privacy is to be found in the area of human procreation and excretion." *State v. Casconi*, 94 Or App 457, 461, 766 P2d 397 (1988) (quoting *Sterling v. Cupp*, 44 Or App 755, 761, 607 P2d 206 (1980), *aff'd as modified*, 290 Or 611, 607 P2d 206 (1981)). Defendant further argues that under both Article I, section 9, and the Fourth Amendment, Blair's actions were unreasonable, given that he had already been strip searched and that there was "nothing to indicate that defendant was engaged in suspicious activity, that he was finished, or that he needed assistance."

The state remonstrates that defendant did not have a protected privacy interest in the holding cell. The state likens this case to the situation presented in *State v. Cromb,* 220 Or App 315, 325, 185 P3d 1120, *rev den*, 345 Or 381 (2008), in which we held that "prevailing social norms do not treat a hospital emergency room, even curtained areas within it, as space in which privacy rights inhere." Similar to a curtained-off emergency room, the state asserts that

---

[3] In the other judgment on appeal, defendant pleaded no contest to compelling prostitution and pleaded guilty to promoting prostitution. As noted earlier, we reject defendant's challenges to that judgment without discussion.

"prevailing social norms—based on the physical and oper-ational realities of a jail—do not treat a jail holding cell as space in which privacy rights inhere." The state emphasizes how "detainees in a jail holding cell do not control access to the cells; jail personnel have exclusive control over that." Finally, the state contends that, even if a search occurred, "Blair's conduct was nonetheless reasonable." According to the state, Blair's observation was brief and not unreason-ably intrusive given the need to "complete the booking pro-cess" and that "nothing indicated that defendant was using the restroom."

In assessing whether defendant maintained a pro-tected privacy interest in the holding cell, we begin with the state constitutional principles before turning to federal constitutional principles. *See, e.g.*, *State v. Copeland*, 353 Or 816, 821, 306 P3d 610 (2013) ("As part of the 'first things first' methodology, we consider state constitutional issues before we consider federal claims."); *State v. Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983) (explaining the practical importance of Oregon's "first things first" approach where "questions of state law [are to] be considered and disposed of before reaching a claim that this state's law falls short of a standard imposed by the federal constitution on all states").

Article I, section 9, protects individuals against unreasonable searches and seizures. A search, in turn, occurs when the "government invades a protected privacy interest." *State v. Meredith*, 337 Or 299, 303, 96 P3d 342 (2004). Under the state constitution, that privacy interest, "is not the privacy that one reasonably expects but the pri-vacy to which one has a right." *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1998) (emphasis omitted). Accordingly, the "privacy interests protected from unreasonable searches under Article I, section 9, are defined by an objective test of whether the government's conduct 'would significantly impair an individual's interest in freedom from scrutiny[.]'" *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993) (quot-ing *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988)). Thus, unlike questions under the federal constitu-tion, the analytical focus under the state constitution "is on the government's conduct rather than on a defendant's

subjective expectations." *State v. Holiday*, 258 Or App 601, 607, 310 P3d 1149 (2013).

As we previously have observed, privacy interests "generally are not self-announcing and, with a few possible exceptions, can be recognized only by their association with a private place where the claimant has the right to exclude others." *Cromb*, 220 Or App at 320. Thus, in addressing the question presented under Article I, section 9, in this case, we must determine whether the holding cell defendant was placed in to use the bathroom "was essentially a private place where he was entitled to freedom from scrutiny." *Id.* As we did in *Cromb*, we pause to consider "the relationship between the prescribed analysis under Article I, section 9, and the pertinent test under the Fourth Amendment." *See id.* at 321-22 ("At least to some extent, * * * Fourth Amendment cases involving factual circumstances similar to those at issue in this case can offer guidance in assessing whether the state violated defendant's privacy interest.").

The Fourth Amendment, unlike Article I, section 9, protects an individual's reasonable expectation of privacy. *Id.* at 322; *see also Hudson v. Palmer*, 468 US 517, 525, 104 S Ct 3194, 82 L Ed 2d 393 (1984) ("The applicability of the Fourth Amendment turns on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." (Internal quotation marks omitted.)). Determining whether an individual has a reasonable expectation of privacy involves two questions: "first, whether the individual has shown that he or she seeks to preserve something as private; second, whether the individual's expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Wacker*, 317 Or at 427-28 (quoting *United States v. Knotts*, 460 US 276, 281, 103 S Ct 1081, 75 L Ed 2d 55 (1983)).

Fourth Amendment decisions on whether, and to what extent, inmates maintain a reasonable expectation of privacy of their bodies, primarily center around the constitutionality of strip searches. Those decisions, however, are nonetheless helpful in framing our analysis in this case. Federal courts generally agree that inmates retain a right

to bodily privacy—albeit, a limited one. *See Henry v. Hulett*, 969 F3d 769, 779 (7th Cir 2020) (noting that the Seventh Circuit joins "every other circuit to have addressed the question and hold that the Fourth Amendment protects (in a severely limited way) an inmate's right to bodily privacy during visual inspections, subject to reasonable intrusions that the realities of incarceration often demand"); *see also Harris v. Miller*, 818 F3d 49, 57 (2nd Cir 2016) (observing that the court previously held "that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy," noting that the court is "aware of no intervening Supreme Court decision," and reiterating "that inmates retain a limited right to bodily privacy under the Fourth Amendment").

In *Bell v. Wolfish*, 441 US 520, 99 S Ct 1861, 60 L Ed 2d 447 (1979), the Supreme Court of the United States articulated the test for evaluating an inmate's Fourth Amendment right to privacy claim. In *Bell*, inmates brought a Fourth Amendment claim against a short-term custodial facility's policy of requiring inmates "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." 441 US at 558. The Court assumed without deciding that "inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility"; but, after "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Court held that the strip search policy was not unreasonable. *Id*. at 558-60. The Court explained:

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."

*Id*. at 559. The Court further noted that a "detention facility is a unique place fraught with serious security dangers,"

where the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.*

In light of a detention facility's need to maintain safety and security through heightened supervision, subsequent cases applying *Bell* generally have concluded that "incidental observations of undressed inmates—particularly ones that are infrequent or at a distance—that are inherent to the continuous surveillance necessary in prisons are almost always reasonable." *See Hulett*, 969 F3d at 783; *see also Smith v. Chrans*, 629 F Supp 606, 611 (CD Ill 1986) (concluding that, in the context of a class-action brought by inmates, "sightings of the plaintiffs in conditions of undress and performing toilet functions were occasional and almost inadvertent," and did not amount to constitutional violations).

With that context in mind, we turn back to the merits of defendant's argument under Article I, section 9. Although we agree with defendant's assertion that the prevailing social assumption is that "generally a restroom is a place where a person has a protected privacy interest," *Holiday*, 258 Or App at 606, we also recognize that privacy, of any kind, is necessarily limited within the context of a jail or detention facility. *See State v. Lien/Wilverding*, 364 Or 750, 760, 441 P3d 185 (2019) (noting "first, that privacy—freedom from government scrutiny—is a fundamental principle and value protected by Article I, section 9 and, second, that privacy is grounded in particular social contexts"). As we have observed, "with a few possible exceptions, privacy interests can be recognized only by their association with a private place where the claimant has the right to exclude others." *Cromb*, 220 Or App at 325 (emphasis omitted). Here, defendant had no right to exclude others. In the same way that hospital personnel, rather than a patient, have control over who is present in a specified area of an emergency room, corrections deputies—not an inmate or detainee—control the level of privacy afforded to those in jail.

Indeed, as the court recognized in *Campbell*, an Article I, section 9, privacy interest "is an interest in freedom from particular forms of scrutiny. The interest is not one of freedom from scrutiny in general, because, if that were the

case, any form of scrutiny would infringe a privacy interest and thereby be considered a search." 306 Or at 170. The particular form of scrutiny here—Blair briefly looking into the holding cell after not hearing any sounds consistent with bathroom use—did not violate a protected privacy interest under the state constitution.[4] For that reason, we conclude that, even if defendant maintained a privacy interest in the holding cell for purposes of using the bathroom, Blair's act of partially lifting the curtain to check on defendant did not amount to an intrusion under the circumstances of this case that violated defendant's rights under Article I, section 9. *See State v. Arreola-Botello*, 365 Or 695, 708, 451 P3d 939 (2019) ("Not every intrusion on an individual's interest in personal security is unconstitutional; Article I, section 9, prohibits only arbitrary, oppressive, or otherwise unreasonable intrusions on those interests." (Internal quotation marks omitted.)).[5]

Finally, we reject defendant's challenge under the Fourth Amendment. In *Hudson*, the Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in [the prisoner's] cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply

---

[4] Defendant does not claim that he had a right to auditory privacy; thus, that issue is not before us.

[5] We note that the Oregon Supreme Court has previously held that inmates and probationers convicted of a felony have a diminished right to privacy. For example, in *State v. Sanders*, 343 Or 35, 163 P3d 607 (2007), the defendant challenged a state statute mandating the collection of blood or buccal samples for purposes of DNA profiling. In rejecting state and federal constitutional challenges to the statute, the court distinguished the rights of felony offenders from the general public:

"In our view, it is the requirement [in the statute] of a felony conviction that is the key here. In most of the cases that we have cited above, the person whose privacy interests were invaded without a warrant had not been convicted. In those cases, the state had no basis for arguing that the person had any lesser privacy right than the general public. On the other hand, the warrant requirement never has been applied to convicted persons who have been placed in state custody as a result of their convictions. That is so because it is inherent in the very notion of punishment for a felony conviction that an offender's freedom is or may be drastically curtailed."

*Id*. at 40. In this case, we need not explore whether a pretrial detainee who was arrested on drug crimes also has a diminished right to privacy similar to that articulated by *Sanders*; rather, we conclude that Blair's actions did not violate any protected privacy interest in the holding cell under Article I, section 9.

within the confines of the prison cell." 468 US at 526. The Court explained that the "recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Id*. Here, whatever expectation of privacy defendant had in the holding cell, if any, Blair's particular intrusion did not violate the Fourth Amendment. Blair attempted to give defendant privacy to use the bathroom and lifted a corner of the curtain only when she realized she had not heard any noise from inside the cell that was consistent with bathroom use. *See Florida v. Royer*, 460 US 491, 500, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (explaining that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). Ultimately, the intrusion was brief and did not result in Blair seeing defendant unclothed. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.