458 A.2d 1225 (1983)
MAINE HUMAN RIGHTS COMMISSION, on their own Behalf and for the Use of Vernard GORDON, Ronald Knowles and John Lyford[1]
v.
CANADIAN PACIFIC LIMITED.
Supreme Judicial Court of Maine.
Argued June 29, 1982.
Decided April 15, 1983.
*1226 Paul F. Macri (orally), Asst. Atty. Gen., Augusta, Harold L. Lichten (orally), Maine Ass'n of Handicapped Persons, Pine Tree Legal Assistance, Inc., Portland, for amicus curiae.
John W. Ballou (orally), Mitchell & Stearns, Bangor, for defendant.
Before McKUSICK, C.J., and GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.
VIOLETTE, Justice.
Plaintiffs Maine Human Rights Commission and individuals Vernard Gordon, Ronald *1227 Knowles, and John Lyford appeal from the judgment of the Superior Court (Penobscot County) dismissing their employment discrimination complaint following the court's acceptance of a Referee's Report recommending the dismissal. Plaintiffs brought this action in April, 1978, alleging that defendant Canadian Pacific Limited (CPL)[2] unlawfully discriminated against the individual plaintiffs because of their physical handicaps in violation of their rights under the Maine Human Rights Act (MHRA), 5 M.R.S.A. §§ 4551-4632, and, specifically, in violation of 5 M.R.S.A. § 4572(1)(A).[3] CPL admitted that Gordon was dismissed and Knowles and Lyford were not hired because of their handicaps; it argued, however, that its discrimination constituted a bona fide occupational qualification (BFOQ), 5 M.R.S.A. § 4572(1), and was permitted by the Maine Human Rights Act's "safety" defense. 5 M.R.S.A. § 4573(4).[4]
On appeal, plaintiffs contend that the Referee applied the incorrect standards to uphold CPL's defenses. We agree. We also determine that application of the correct standards requires that we reverse the finding of the Superior Court and vacate the judgment.

I.
After being dismissed or not hired by CPL, the individual plaintiffs complained to the Maine Human Rights Commission (Commission) about CPL's physical handicap-based discrimination. The Commission found that reasonable grounds existed for the complaints and attempted, unsuccessfully, to dispose of the complaints informally, as required by 5 M.R.S.A. § 4612(3).
The Commission then brought suit in Superior Court on behalf of the individual plaintiffs. The case was tried before a Referee who ruled that the appropriate legal standard to determine the adequacy of CPL's defenses was "to determine if, in fact, a given job qualification has been adopted in a bona fide manner, or if the excluded handicap has a rational relationship to the safety of those who engage in the operation of the business ...." Applying that standard, the Referee concluded that CPL's employment practices did not violate the MHRA. He therefore recommended judgment for the defendant CPL. The Referee's Report was accepted by the Superior Court over plaintiff's objections and judgment for defendant was entered dismissing the complaint.

A. Vernard Gordon
Vernard Gordon was hired by CPL as a seasonal "cookee," or cook's helper, in May 1976. Although Gordon wore a leg brace, CPL did not require a physical examination of him at any time prior to or during his employment. Gordon worked from May *1228 until July, 1976 and, according to undisputed testimony, performed his job satisfactorily. When one of his superiors learned that Gordon wore a leg brace, Gordon was ordered dismissed. No inquiry was made into the adequacy of Gordon's performance.
CPL's Chief Medical Officer, Dr. William May, testified that when he reviewed Gordon's case in 1977, he informed Gordon's Division Superintendent that, had he been asked about Gordon's continued employment, he would not have considered Gordon's handicap a disability and would have considered Gordon acceptable for employment as a cookee. Dr. Max P. Rogers, a general surgeon and Medical Director of the Southern Railway System, however, testified for CPL that no one with Gordon's handicap would be able to serve as a cookee without the risk of injury to themselves or others.

B. Ronald Knowles
After undergoing a laminectomy and spinal fusion in 1972, Ronald Knowles applied for employment with CPL as a trainman in 1973 and 1976. In 1973, he received a pre-employment medical examination from a CPL approved medical examiner (CPL examiner)[5] who noted Knowles's recent surgery but approved his fitness for employment as trainman. The report was then forwarded to Dr. May. Dr. May told the CPL regional superintendent that if Knowles was applying for employment, he should be rejected because of his back condition. If, however, he was a regular employee applying to return to work after surgery, then his medical condition was satisfactory.
Knowles was then examined by a CPL Area Medical Officer[6] and by Dr. John McGinn, the private orthopedic surgeon who had performed Knowles's surgery. Both concluded that Knowles had fully recovered from the surgery. Dr. McGinn's report did not reach Dr. May's office but, in spite of the Area Medical Officer's report, Knowles's first application was finally rejected.
In 1976, Knowles reapplied for a trainman position with CPL. This time, Dr. May's office received a second report from Dr. McGinn affirming Knowles's full recovery. Dr. May's office, noting that further examinations would not alter its decision, again rejected Knowles.
Dr. May testified before the Referee that CPL did not hire applicants until six troublefree years following a laminectomy and spinal fusion. The six year period was based on Dr. May's conclusion after discussions with company consultants that, after six troublefree years, most workers did not suffer further related injuries. Dr. May did acknowledge that some applicants might safely enter the CPL labor force in less than six years. Dr. Rogers recommended a longer wait after such surgery, testifying that, even eight years after a laminectomy and spinal fusion, anyone working as a trainman would be likely to reinjure his back.

C. John Lyford
John Lyford, a seasonal heavy laborer for CPL from 1970-78, unsuccessfully applied for permanent employment as a sectionman in 1974 and 1976. In 1974, Lyford was examined by a CPL examiner who discovered that Lyford had a heart murmur. The physician nevertheless found him fit for *1229 employment as a sectionman. Dr. May's assistant, Dr. Katz, overruled that recommendation but suggested that Lyford's application would be reconsidered if Lyford were to obtain a more thorough cardiac examination. Lyford then consulted Dr. James K. Conrad, a cardiologist, who examined Lyford and forwarded the results of his examination to CPL. Dr. Conrad diagnosed Lyford's heart murmur as caused by a "bicuspid aortic valve[7] ... which is of no hemodynamic consequence," i.e., it did not interfere with the flow of blood within Lyford's heart, and noted that "[t]here is no reason for [Lyford] to have any reason to anticipate any real difficulty in this minimal lesion." Dr. Katz told the CPL regional superintendent that the cardiologist had confirmed Lyford's heart murmur, that the murmur was "a potentially disabling condition," and that Lyford's application was again rejected.
On the recommendation of his immediate supervisor, who was pleased with Lyford's work as a seasonal employee, Lyford reapplied for permanent employment as sectionman in 1976. His heart murmur was not detected during the pre-employment physical and the CPL medical examiner recommended Lyford's employment. Lyford's previous medical history was brought to Dr. May's attention, however, and Lyford was again rejected. The reason given the CPL medical examiner by Dr. May was that, according to the medical literature, Lyford's heart murmur could lead to a condition which often resulted in sudden heart failure later in life. Shortly thereafter, Lyford was medically approved for summer employment with CPL.[8]
Dr. May testified that, although a biscuspid aortic valve does not in itself, pose any increased danger of sudden heart failure and does not inherently lead to further complications, a bicuspid aortic valve does lead, in a statistically significant number of cases, to aortic stenosis, a narrowing of the aortic valve opening which often results in sudden heart failure. Dr. May then testified that Lyford was rejected solely because of the general statistical link between bicuspid aortic valves and aortic stenosis, leading him to fear Lyford's potential for developing the stenosis, and with it, a risk of sudden heart failure, in the future. Dr. May did not specifically discuss Lyford's case with any cardiologists prior to either of Lyford's employment rejections and May was unable to testify as to the numerical correlation between Lyford's ailment and the aortic stenosis.
Dr. Elliot A. Sagall, a CPL expert cardiological witness, agreed with Dr. May that there is no inherent link between bicuspid aortic valves and aortic stenosis. Although he testified that some persons with bicuspid aortic valves do develop aortic stenosis, he added that the onset of stenosis can generally be detected through periodic examinations. Dr. Sagall did not in any way refute the diagnosis of "no hemodynamic consequence" made by Lyford's cardiologist after a physical examination. Dr. Rogers, however, testified that anyone with a bicuspid aortic valve inherently suffers from aortic stenosis as well, even if the stenosis has not yet progressed to the point where it can be diagnosed.

II.
The Maine Legislature, by enactment of the Maine Human Rights Act, has,
to protect the public health, safety and welfare, ... declared [it] to be the policy *1230 of this State to keep continually in review all practices infringing on the basic human right to a life with dignity, and the causes of such practices, so that corrective measures may, where possible, be promptly recommended and implemented, and to prevent discrimination in employment... on account of race, color, sex, physical or mental handicap, religion, ancestry or national origin ....
5 M.R.S.A. § 4552 (emphasis added). The Fair Employment provisions of the MHRA specifically declare as the policy of the State of Maine that every individual has the civil right to secure employment without discrimination based on race, color, sex, physical or mental handicap, religion, age, ancestry or national origin. 5 M.R.S.A. § 4571. The MHRA, like its federal counterpart, requires "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously on the basis of ... impermissible classification[s]." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971); see Maine Human Rights Commission v. Local 1361, 383 A.2d 369, 373-75 (Me.1978).

A.
The MHRA places on the plaintiff the burden of proving, by a fair preponderance of the evidence, that the alleged unlawful employment discrimination occurred. 5 M.R.S.A. § 4631. In Maine Human Rights Commission v. City of Auburn, 408 A.2d 1253, 1261-68 (Me.1979), we analyzed the three-step process to be followed by the plaintiff in satisfying this burden. See also Local 1361, 383 A.2d at 378; Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207, 215-17 (1981); Comment, The Prima Facie Case Approach to Employment Discrimination, 33 Maine L.Rev. 195 (1981). Once discrimination has been established, however, either by evidence adduced at trial or, as in the instant case, by the defendant's admission, the defendant employer, to avoid liability under the MHRA, must then demonstrate that its discriminatory practices were permitted under statutorily defined exceptions to the MHRA's general prohibitions against discrimination and were thus not unlawful. See Percy v. Allen, 449 A.2d 337, 343 (Me.1982); Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228, 231-32 (5th Cir.1969). These exceptions, e.g., 5 M.R.S.A. §§ 4572(1), 4573(4), constitute affirmative defenses and require that the employer assume the burden of proving by a preponderance of the evidence that its discriminatory practices fall within the purview of the statutory exceptions. Percy, 449 A.2d at 343.
CPL relies, in the instant case, on two affirmative defenses under the MHRA to justify its admitted discrimination against the physically handicapped individual plaintiffs. First, CPL looks to the provision in the Fair Employment statute outlawing employment discrimination against the physically handicapped "except when based on a bona fide occupational qualification...." 5 M.R.S.A. § 4572(1). Such a defense, formulated similarly to one found in Title VII of the Federal Civil Rights Act of 1974, 42 U.S.C. § 2000e-2(e), is generally known as a BFOQ defense. Second, CPL relies on 5 M.R.S.A. § 4573(4) (hereinafter referred to as the "safety" defense), which permits employment discrimination against physically handicapped employees[9] when an employee's handicap renders him unable to perform his duties or perform those duties safely and healthily (i.e., "in a manner which would not endanger the health or safety of the employee or the health or safety of others," 5 M.R.S.A. § 4573(4)). While other states' fair employment statutes provide for a defense similar in scope *1231 to Maine's "safety" defense, none employs the precise language contained in the Maine statute.[10]
According to the Referee below, a court may review an employer's policies "to determine if, in fact, a given job qualification has been adopted in a bona fide manner, or if the excluded handicap has a rational relationship to the safety of those who engage in the operation of the business, or of others in proximity thereto." The Referee clearly applied a "bona fide", or good faith, test to both the BFOQ and safety defenses; it is unclear whether the "rational relationship" test was applied to both defenses or to the safety defense alone. We determine, however, that neither standard is applicable to either defense.
As this Court has previously held, an employer's good faith is not at issue in determining the validity of discriminatory employment practices under the MHRA. "The touchstone of our statutory prohibition is whether in fact the disputed practice results in unlawful employment discrimination." Local 1361, 383 A.2d at 375 (note omitted). The MHRA is intended to prevent discrimination against the physically handicapped based on unfounded stereotyping. That stereotyping is no less harmful to the handicapped employee when it is based on good faith.[11]See Griggs, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165; Montgomery Ward & Co. v. Bureau of Labor, 280 Or. 163, 169, 570 P.2d 76, 79 (1977) (employer's good faith relevant only to whether sanctions and damages will be imposed).
The "rational relationship" test, as generally applied in constitutional equal protection analysis, requires only that some conceivable set of facts could rationally support the distinctions drawn. Beaulieu v. City of Lewiston, 440 A.2d 334, 338-39 (Me. 1982); Warren v. Municipal Officers of Gorham, 431 A.2d 624, 628 (Me.1981). In our opinion, such a highly deferential standard of review, though applicable in reviewing many legislative classifications, is clearly inappropriate when reviewing the adequacy of an affirmative defense raised by an employer against whom a case of employment discrimination has already been established. See Pushkin v. Regents of University of Colorado, 658 F.2d 1372, 1383 (10th Cir. 1981) (rational relationship test inapplicable to handicap-based discrimination under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794); Williams v. Colorado Springs School District, 641 F.2d 835, 841 (10th Cir. 1981) (rational relationship test inapplicable in gender discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17); Montgomery Ward, 280 Or. at 168, 570 P.2d at 79 ("reasonable possibility" of worker's incapacitation too low a standard under Oregon's Handicapped Persons' Civil Rights Act, Or. Rev.Stat. § 659.425). We believe that permitting an employer to justify discriminatory policies merely by showing that those policies had some rational relationship to employee safety would greatly weaken the State's clear objective, expressed in the MHRA, of according strong guarantees against employment discrimination.

B.
The BFOQ defense permits an employer to discriminate against an entire *1232 class of employees without requiring any individual assessment of each employee's abilities. Because such stereotyping is contrary to the general intent of the MHRA, the BFOQ defense must be given "an extremely narrow" interpretation. Percy, 449 A.2d at 343 (quoting Dothard v. Rawlinson, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786, 800 (1977)); City of Auburn, 408 A.2d at 1266.
We noted in Percy that successful assertion of a BFOQ defense in a gender discrimination case requires satisfaction of the two-pronged test[12] adopted by the United States Supreme Court in Dothard: the employer must prove by a preponderance of the evidence (1) that the essence of the business operation requires the discriminatory practice and (2) that it had a factual basis to believe that all or substantially all persons in the excluded category would be unable to safely or efficiently perform the duties of the job involved.[13]Percy, 449 A.2d at 343; Dothard, 433 U.S. at 333, 97 S.Ct. at 2729, 53 L.Ed.2d at 800; see Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 234-36 (5th Cir.1976); Hodgson v. Greyhound Lines, Inc., 499 F.2d 859, 861-63 (7th Cir.1974), cert. denied sub. nom Brennan v. Greyhound Lines, Inc., 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975). Percy did not require our adopting the two-pronged Dothard test. We now specifically adopt that test to apply to cases under the MHRA involving employment discrimination against the physically handicapped.
Percy relied heavily on the similarities between the Maine and federal formulations of the BFOQ defense[14] in deciding to apply federal case law interpreting the standard. The federal BFOQ, however, applies to a statute which does not include the physically handicapped. The federal standard may thus be argued to be an inappropriate guide in a physical handicap-based employment discrimination case under the MHRA.[15] We determine, however, that Maine law will not support any such distinction between gender and physical handicap-based discrimination.
The MHRA prohibits employment discrimination based on any one of several characteristics. The statute recognizes that in certain areas, special problems arise in the employment of the handicapped. See, e.g., 5 M.R.S.A. §§ 4572(1)(D)(1)-(4), *1233 4573(4). The MHRA does not, however, distinguish between the application of the BFOQ defense to occupational qualifications based on either physical handicaps or other prohibited classifications and there is no legislative history indicating that such a distinction was intended. In light of the MHRA's expressed policy of providing all persons with a fair employment opportunity, we decline to create such a distinction ourselves. See Sterling Transit Co. v. Fair Employment Practice Commission, 121 Cal. App.3d 791, 796-97, 175 Cal.Rptr. 548, 550-51 (1981) (construing California's similarly worded BFOQ provision, Ca.Gov't Code § 12940, to require application of the same standard in general and handicap-based employment discrimination cases).
Applying the BFOQ standard we herein adopt to CPL's defense, we conclude that CPL failed, as a matter of law, to carry its burden of persuasion as to any of the three individual plaintiffs. Even assuming, as CPL contends, that in all three cases CPL had an unwritten policy of excluding from employment persons with each plaintiff's handicap, the record will not support a conclusion that CPL had a factual basis for believing that all or substantially all persons with plaintiffs' handicaps would be unable to adequately perform their duties.
CPL admitted that it dismissed Gordon because he wore a leg brace, yet it presented no evidence that it ever believed that substantially all persons with leg braces would be unable to function as cookees.
Only anecdotal evidence was introduced to support CPL's refusal to consider as applicants for the trainman position persons who had undergone back surgery within six years. The CPL policy of permitting trainmen already employed by the company to return to work prior to six years from the time of a laminectomy and spinal fusion, certainly an admirable rehabilitative gesture, suggests CPL recognition that all persons with such surgery need not wait six years before performing safely and efficiently as trainmen.
CPL's apparent policy of not hiring sectionmen with heart murmurs was based on CPL's fear that such persons posed an unacceptably high risk of sudden heart failure on the job. Dr. May conceded, however, that he understood that Lyford's ailment, a bicuspid aortic valve, itself posed no increased risk of sudden heart failure and that aortic stenosis, the condition actually associated with heart failure, was not an inevitable result of a bicuspid aortic valve. Dr. May also was unable to produce any statistical evidence to support a finding that substantially all sectionmen with bicuspid aortic valves would be unable to safely and efficiently perform their jobs.

C.
The Maine safety defense permits handicap-based employment discrimination in individual cases when the employee's handicap renders him "unable to perform his duties or perform those duties in a manner which would not endanger the health or safety of the employee of the health or safety of others ...." 5 M.R. S.A. § 4573(4). This provision must be interpreted wholly as a matter of Maine law, as there is no analogous federal statute from which to draw guidance.[16]See Percy, 449 A.2d at 342-43.
The Referee below concluded that, when dealing with large numbers of employees *1234 over broad geographical areas, "it becomes impractical to deviate on an individual basis." The safety defense, however, unlike the BFOQ defense, requires individual assessments of the relationship between an employee's handicap and the specific legitimate requirements of his job. Sterling Transit, 121 Cal.App.3d at 798, 175 Cal. Rptr. at 551; see Silverstein v. Sisters of Charity, 43 Colo.App. 446, 614 P.2d 891 (1979); Chicago, M., St. P. & P. R.R. v. Dept. of Industry, Labor & Human Relations, 62 Wis.2d 392, 398-99, 215 N.W.2d 443, 446 (1974).
It is our opinion that the Maine safety defense imposes upon the employer the burden of establishing that it had a factual basis to believe that, to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform such duties in a manner which will not endanger his own health or safety or the health or safety of others. See Dairy Equipment Co. v. Dept. of Industry, Labor & Human Relations, 95 Wis.2d 319, 332, 290 N.W.2d 330, 336 (1980); Montgomery Ward, 280 Or. at 168-69, 570 P.2d at 79. Only by requiring that an employer have a strong factual basis for employment discrimination against the handicapped can the State's declared policy in the MHRA, to protect the civil rights of the physically handicapped to a fair employment opportunity, be effectively carried out.
We also construe the statute to refer to an employee's future ability to carry out his employment duties. We do not believe that the legislature intended to require an employer to employ a handicapped person when the employer could prove that it had a factual basis to believe, to a reasonable probability, that such employment would cause a future deterioration of the employee's health or endanger his safety or endanger the health and safety of others. See Bucyrus-Erie Co. v. Dept. of Industry, Labor & Human Relations, 90 Wis.2d 408, 423-24, 280 N.W.2d 142, 149-50 (1979). An employer cannot, however, presently deny an employee an equal opportunity to obtain gainful employment on the mere possibility that his physical handicap might endanger his or others' health or safety at some indefinite future time. Sterling Transit, 121 Cal.App.3d at 799, 175 Cal.Rptr. at 552; Providence Journal Co. v. R.I. Commission, 13 Fair Empl.Prac.Cas. (BNA) 168, 170 (R.I. Super.Ct.1975); Bucyrus-Erie, 90 Wis.2d at 419-25, 280 N.W.2d at 147-50.
Examining the record in light of our enunciated standard for application of the safety defense, we find, as we did under the BFOQ, that CPL failed as a matter of law to carry its burden of persuasion as to any of the three individual plaintiffs.
CPL clearly reached its decision to dismiss Gordon without any individual assessment of his ability to safely and healthily carry out his duties as cookee. To the contrary, Dr. May testified that, after Gordon's dismissal, he told Gordon's supervisor that, had he been consulted, he would have considered Gordon acceptable for employment as a cookee.
Although CPL established through the testimony of Dr. May and Dr. Rogers that employment as trainmen of some persons who had undergone a laminectomy and spinal fusion within six years poses health and safety risks to the handicapped employee and to others, CPL did not establish that Knowles's employment posed such a risk. Dr. May conceded that some persons who undergo such surgery may safely return to employment as trainmen within two years. In fact, if Knowles had already been employed by CPL up until his surgery, he would have been permitted to return to *1235 work on the basis of his 1973 pre-employment examination.[17] CPL, however, refused to consider Knowles's application in spite of the unanimous conclusion of the physicians who examined him that he had completely recovered from surgery. CPL cannot now claim that it had a factual basis on which to deny Knowles's applications.
CPL's explanation of its rejection of Lyford's applications for permanent employment as a sectionman can be reduced to the following syllogism: Some persons with bicuspid aortic valves will develop aortic stenosis. All persons with aortic stenosis run a high risk of sudden heart failure. Therefore, hiring Lyford, an employee with a bicuspid aortic valve, as a sectionman would "endanger the health or safety of the employee or the health or safety of others."
Even assuming the truth of CPL's premises, however, CPL failed to establish a valid safety defense as to Lyford. As with Gordon and Knowles, CPL failed to establish that Lyford, individually assessed, would be unable to perform his job without endangering his health or safety or the health or safety of others. CPL never contended that it at any time believed either that Lyford ran a higher than average risk of sudden heart failure or that, if Lyford was employed as a sectionman, CPL would be unable to detect early signs of the development of aortic stenosis. The evidence, in fact, showed that the only cardiological examination of Lyford resulted in a diagnosis that his bicuspid aortic valve condition was of "no hemodynamic consequence", i.e., there was no interference with the flow of blood to his heart.
While Dr. Rogers (a general surgeon), did testify that anyone with a bicuspid aortic valve inherently suffers from aortic stenosis as well, both Dr. May and Dr. Sagall (a cardiologist) denied that such an inherent link exists. Further, CPL never contended that it relied on such a link in rejecting Lyford's employment application. His application was rejected solely because of Dr. May's fear that, because of the general statistical link between bicuspid aortic valves and aortic stenosis, Lyford had the potential for developing stenosis, the condition which could result in serious consequences. CPL never established more than a possibility that Lyford's diagnosed handicap presented a present or future danger to his health and safety or to the health and safety of others.

III
We conclude that it was error for the Superior Court to accept the Referee's Report because the Referee applied erroneous legal standards in determining whether CPL had sustained its burden of proof on the BFOQ and safety defenses. We further conclude that, as a matter of law, application of the standards articulated in this opinion requires a finding that CPL failed to establish a valid BFOQ or safety defense as to any of the individual plaintiffs. We therefore reverse the finding of the Superior Court; we further vacate the judgment and remand the case to the Superior Court for further proceedings on remedies.
The entry is:
Appeal sustained.
Judgment vacated.
Case remanded to Superior Court for further proceedings on remedies.
All concurring.
NOTES
[1] 5 M.R.S.A. § 4612(4)(B) empowers the Maine Human Rights Commission to bring this action in Superior Court. We therefore delete State of Maine as a plaintiff.
[2] Canadian Pacific Limited is a railroad company operating throughout Canada and in portions of the United States.
[3] The statute reads in pertinent part:

It shall be unlawful employment discrimination, in violation of [the Maine Human Rights Act], except when based on a bona fide occupational qualification:
A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of ... physical ... handicap, or because of any such reason to discharge an employee .... 5 M.R.S.A. § 4572(1).
[4] The statute reads:

Nothing in [the Maine Human Rights Act] shall prohibit an employer from refusing to hire or discharging a physically or mentally handicapped employee, or subject an employer to any legal liability resulting from the refusing to employ or the discharge of a physically or mentally handicapped employee, where the employee, because of the physical or mental handicap, is unable to perform his duties or perform those duties in a manner which would not endanger the health or safety of the employee or the health or safety of others or to be at, remain or go to or from the place where the duties of employment are to be performed.
5 M.R.S.A. § 4573(4).
[5] CPL maintains a list of approximately 350 physicians across Canada and the United States who agree to perform physicals on CPL employment applicants. These physicians, denominated by CPL "approved medical examiners," are paid on a fee-for-service basis by CPL to take an applicant's medical history, perform an examination, record the findings on a CPL form, make an initial recommendation as to the applicant's fitness, and forward the information to the CPL Office of Medical Services for a final determination.
[6] An Area Medical Officer is a practicing physician paid a retainer by CPL primarily to be available to the Claims Department in workers' compensation cases.
[7] The aortic valve controls the flow of blood from the left ventricle of the heart into the aorta. Most persons have a tricuspid valve, i.e., a valve with three closure flaps; some persons, however, have bicuspid or unicuspid valves.
[8] It appears from the record that Lyford was not required to undergo a physical examination prior to each summer's employment. After his rejection for permanent employment in 1976, however, Lyford personally called CPL's Medical Services office to inquire about employment that summer.
[9] In this opinion, we use the term "employee" broadly to refer to all persons protected by the MHRA's Fair Employment provisions.
[10] E.g., Colo.Rev.Stat. § 24-34-801(1)(b) (1981) (Colorado); Fla.Stat.Ann. § 413.08(3) (1982) (Florida); N.J.Stat.Ann. § 10:5-4.1 (1982) (New Jersey); Or.Rev.Stat. § 659.425(1) (1981) (Oregon); Wash.Rev.Code Ann. § 49.60.180(1) (1982) (Washington); Wis.Stat.Ann. § 111.32(5)(f) (1981) (Wisconsin).
[11] The Referee cited McDonnell Douglass v. Green, 411 U.S. 792, 800-01, 805, 93 S.Ct. 1817, 1823, 1825-26, 36 L.Ed.2d 668, 676-77, 679 (1973), and Griggs, 401 U.S. at 430-31, 91 S.Ct. at 853, 28 L.Ed.2d at 164, in support of his conclusions. Both cases, however, deal solely with the prima facie discrimination case and not with affirmative defenses. Also, neither case suggests that an employer's good faith is relevant to establishing unlawful discrimination.
[12] Percy, involving a challenge to a Maine State Prison rule that only males could serve as prison guards at that all-male penitentiary, relied on a third component of the test applicable only in cases when

discriminatory conduct is rooted in the privacy interests of those [e.g., prison inmates] with whom the complainant has contact .... This element is accommodation: the employer must demonstrate that it could not reasonably rearrange job responsibilities or engage in alternative practices so as to minimize the clash between the privacy interests of the inmates and the fundamental principle barring discrimination in employment.
449 A.2d at 343.
[13] A more general rule may be applied in the rare case when the employer demonstrates that it is "impossible or highly impractical" to deal with handicapped employees on an individualized basis. See Weeks, 408 F.2d at 235 n. 5. Examples include a plant with a "highly refined, bizarre, and extraordinarily complex system of seniority and job assignment," id. (quoting Bowe v. Colgate-Palmolive Co., 272 F.Supp. 332, 356 (S.D.Ind.1967)), or a situation where "some members of the discriminated-against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership in the class." Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 235 (5th Cir.1976) (note omitted). Although the Referee found that CPL's large and widespread work force renders individual deviations in employment policy "impractical", there was no evidence to support that finding.
[14] Codified, respectively, at 5 M.R.S.A. § 4572(1) and 42 U.S.C. § 2000e-2(e).
[15] In a slightly different context, however, we noted that although the prima facie discrimination case described in Griggs dealt only with racial discrimination, the federal courts have applied the same basic analysis to other types of prohibited discrimination. Local 1361, 383 A.2d at 373 n. 5.
[16] Plaintiffs argue that the federal "business necessity" test, adopted by this Court in City of Auburn, 408 A.2d at 1265, controls our interpretation of the Maine safety defense. The business necessity test, created by the federal courts, permits an employer to rebut a prima facie employment discrimination case by showing that the challenged hiring criteria are "necessary to safe and efficient job performance." Dothard, 433 U.S. at 332 n. 14, 97 S.Ct. at 2728 n. 14, 53 L.Ed.2d 799 n. 14; see Griggs, 401 U.S. at 436, 91 S.Ct. at 856, 28 L.Ed.2d at 167. It is thus available only to validate uniform employment criteria having a discriminatorily disparate impact. City of Auburn, 408 A.2d at 1265; Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280, 300-01 (1975). The test does not apply to cases under the safety defense, which involve individual determinations that particular handicapped employees are unable to safely perform their duties.
[17] Dr. May noted that, in addition to CPL's perceived moral obligation to assist in the rehabilitation of injured employees, a returning employee would be expected to have the experience and seniority to avoid any safety risks. Knowles, however, worked as a CPL trainman from 1962-1969 before voluntarily leaving the railroad industry.